UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEVEN ANDERSON, | |
| Petitioner, | Case No. 1:02-cv00204-BLW |
| vs. | **MEMORANDUM DECISION AND ORDER** |
| WARDEN CARLIN, | |
| Respondent. | |

On March 31, 2014, Magistrate Judge Larry M. Boyle denied Respondent Warden Carlin's Amended Motion for Partial Summary Dismissal on Claims Two, Three, Eight, and Nine (Dk. 38-2) in this habeas corpus matter, concluding that determining the claims on the merits would be the most judicially efficient way to address all of Petitioner Steven Anderson's claims. Respondent has addressed the merits of the claims and reserved all procedural defenses in her Response to the Petition for Writ of Habeas Corpus. Petitioner has filed a Traverse, with exhibits. (See Dkt. 56.)

The Amended Petition, which contains twelve claims, is now fully briefed. (Dkt. 22.) Having reviewed the parties' briefing and the record in this matter, including the

state court record, the Court concludes that oral argument is unnecessary. Accordingly, the Court enters the following Order.

## INTRODUCTION AND SUMMARY OF RULING

Petitioner Steven Anderson was convicted of aggravated battery in the Fifth Judicial District Court in Twin Falls County, Idaho. A judgment of conviction was entered on May 14, 1999. Petitioner received a unified sentence of fifteen years with seven years fixed.

The Idaho Court of Appeals has thrice reviewed Petitioner's conviction and sentence, and has provided Petitioner with no relief. Petitioner's conviction and sentence were affirmed on direct appeal on February 27, 2001. (State's Lodging B-7.) The state district court order summarily dismissing Petitioner's post-conviction petition was affirmed on June 2, 2006. (State's Lodging D-15.) The state district court order summarily dismissing Petitioner's successive post-conviction petition as procedurally barred was affirmed on May 30, 2012. (State's Lodging F-4.)

On direct review, the Idaho Court of Appeals summarized the facts underlying the conviction as follows:

> Pertinent events began with a conversation between Anderson and his girlfriend, C.B., as C.B. and Brenda Owens were sitting in a car about to leave Owen's home. While Anderson and C.B. were discussing their relationship through the passenger window, Anderson became upset, reached in, and grabbed C.B.'s glasses. C.B., in need of her glasses because she is able to discern only colors and shapes without them, exited the car and pursued Anderson up the driveway. On the assumption that Anderson had put her glasses in a black bag that he carried, C.B. tried to take the bag

away. The two struggled over the bag, with C.B. either giving up or Anderson prevailing. C.B. then entered the residence while two friends, Owens and Dan Winkler, looked for her glasses on the ground. Anderson also entered the residence a minute or two after the struggle ended.

C.B. testified that she was seated at a table when Anderson entered. She was able to identify him by his size, shape, and voice. The only other person in the room was Pam Olsen, whom C.B. was able to identify after talking to her. According to C.B. the argument between Anderson and C.B. continued. C.B. testified that she saw ["somebody"] ["lean over"] the table. The next thing she remembers is being on the floor holding her face and screaming from pain. She then saw Anderson's shoes as he was leaving the room. Witnesses who entered the kitchen immediately thereafter testified that they found C.B. lying on the floor, screaming and holding her face. It was later determined that C.B.'s jaw was broken.

(State's Lodging B-7, pp. 1-2; parentheticals added to reflect actual trial testimony.)

C.B. did not report the battery incident until two weeks later, when she reported that Petitioner had raped her. (State's Lodging B-7, p. 2.) Petitioner was charged with aggravated battery and rape, but the two charges were severed for trial. Separate juries convicted him of both offenses. (States' Lodgings A-1, pp. 52-53; D-15, pp. 2-3.)

On direct appeal of the aggravated battery conviction, the Idaho Court of Appeals concluded that the evidence of Petitioner Anderson's guilt "was overwhelming and was not based merely on C.B.'s testimony." (State's Lodging B-5, p. 5.) That evidence included the following:

Witnesses observed Anderson and C.B. in a heated argument immediately before the battery and saw him enter the room where the injury occurred. Witnesses who entered the room immediately thereafter saw C.B. lying on the floor, crying and holding her face in pain. Both C.B. and another witness testified that Anderson was wearing some type of fingerless glove on his right hand a few days after the incident. C.B. also

**MEMORANDUM DECISION AND ORDER - 3**

testified that Anderson's right hand was swollen, that he complained that her face had injured his hand, and that in a subsequent argument Anderson threatened to break her jaw again if she did not stop screaming. Dr. Mark A. Plant, the surgeon who operated on C.B.'s broken jaw, testified that the injury could not have been caused by a fall on the chin or cheek, and that she must have been struck with a great deal of force by a blunt object, such as a human fist, right below the cheekbone.

(State's Lodging B-7, pp. 5-6.)

In addition to the above, the Idaho Court of Appeals cited the following as part of the "overwhelming evidence" that supported Petitioner's aggravated battery condition: "[T]here was testimony from witnesses who heard Anderson brag that he had broken C.B.'s jaw." (State's Lodging B-, p.6.) No such evidence was introduced at the aggravated battery trial. However, at the rape trial, which followed the battery trial, Patrick Gilbert testified that Petitioner told Patrick that he had broken C.B.'s jaw. (State's Lodging E-3, p. 482.)

In this federal habeas corpus action, Petitioner asserts that, if certain evidence available at the time of trial had been presented to the jury by the prosecutor and defense counsel, he would not have been convicted of aggravated battery, but only misdemeanor battery. The difficulty with Petitioner's claims is that—amidst witnesses' imperfect memories and inconsistencies in the descriptions of what happened—there remains a clear causal connection running from Petitioner striking C.B. in the kitchen with enough force to knock her from her chair, to C.B. screaming in pain, to the subsequent

conclusions that C.B.'s jaw was broken and Petitioner's right hand was injured as a result of striking C.B.

Petitioner makes much ado over variations between what C.B. and other witnesses said prior to trial and what they testified to at trial. In the videotaped police investigation interview, C.B. said Petitioner hit her in the face when she was trying to get her glasses back, and Dan Winkler said he honestly did not think that Petitioner broke her jaw at that point. Winkler also reported that, after C.B. was hit and had fallen to the floor, either Pam Olsen or Brenda Owens "hollered, 'He hit her right at the table.'" Winkler said he thought *this* was the point when Petitioner broke C.B.'s jaw. In the videotape, C.B. said that she did not remember Petitioner hitting her *in the house*. (Dkt. 22, pp. 16-17.) C.B. testified at trial that she did not remember being hit, and when asked why she didn't remember, she testified: "I don't know. I just know there was a lot of pain." (State's Lodging E-3, p.199.) She also testified at trial that she and Petitioner argued at the kitchen table, she saw someone lean across and hit her, and she saw Petitioner's shoes by her head as she lay on the floor.

Petitioner also challenges his trial counsel's defense strategy, which was to demonstrate that (1) no one actually saw Petitioner hit C.B. in the kitchen, and (2) Petitioner later told some acquaintances that her ex-husband, Dan Winkler, had hit her. Petitioner's proposed defense strategy was twofold: he only slapped C.B., which could not have caused her injury, and she instead broke her jaw falling from her bicycle.

MEMORANDUM DECISION AND ORDER - 5

Petitioner's preferred defense is supported by his own new accident reconstruction opinion (with diagrams), where he argues that it was "100% physically impossible" for a man who is 5'6" to reach across a 45 to 60" table to strike C.B. with enough force to knock her out of the chair. (Dkt. 56, pp. 14-17; 56-3.) Petitioner also outlines the proposed testimony he would have given at trial had he been afforded the opportunity to testify. He states that he slapped C.B. when she wouldn't give him back his camera in the kitchen, and that it was not the slap, but C.B.'s own efforts in continuing to struggle for the camera that made her fall out of the chair. (Dkt. 56, pp. 26-31.) Petitioner states that C.B. did not break her jaw until she fell from her bicycle one or two days after the slapping incident. He alleges that C.B. was riding her bike and looking for him without her glasses on when she ran into Dan Winkler's astroturf-covered mobile home patio stairs. He alleges that he was wearing one black glove because he had a large blister on his hand from a paint-scraping job that hurt when he held onto his bicycle handlebars.

After an extensive review of the record and of the parties' arguments and exhibits, this Court concludes that Petitioner's version would not have changed the outcome of the trial or affected the clear causal connection existing among the strike, the scream, and the broken jaw and injured hand. Petitioner seems to believe that conflicting testimony and evidence should not have been admitted at all; to the contrary, the jury, as the factfinder, is charged with examining and weighing all of the evidence, and accepting or rejecting certain pieces of evidence as it sees fit under the law and all of the circumstances.

The best way to dispel Petitioner's fallacious thinking is to explain that prosecutors and jurors must use "abductive reasoning" to reach conclusions in a criminal case. "Abductive reasoning" is formulating and testing a hypothesis on the best information available, and eventually coming to a conclusion based on that information, because it is the best explanation for the phenomenon, despite a lack of certain or complete information.[1] On the date and time set for trial, both sides are required to bring forward the favorable evidence they have been able to garner so that the jury can test the truth of all the evidence. The law prevents parties from presenting irrelevant, unduly prejudicial, and known false evidence, but it is otherwise up to the jury to weigh the strength and accuracy of each piece of evidence, and to reject what doesn't fit.

Petitioner has not shown that any evidence presented by the prosecution was known to be false; Petitioner merely argues with the witnesses' perceptions, memories, and the words they selected to describe what they believed they saw and heard.

Even if Petitioner would have been able to present all of his additional evidence, the entirety of the evidence still overwhelmingly supports his conviction. In addition, the Idaho Court of Appeals' mistake regarding Patrick Gilbert's testimony does not affect the

---

[1] See "Deductive Reasoning v. Inductive Reasoning," at livescience.com. 10 July 2012. Web. http://www.livescience.com/21569-deduction-vs-induction.html. See also "Deductive, Inductive, and Abductive Reasoning, at butte.edu. Web. http://www.butte.edu/departments/cas/tipsheets/thinking/reasoning.html, for several examples:

> A medical diagnosis is an application of abductive reasoning: given this set of symptoms, what is the diagnosis that would best explain most of them? Likewise, when jurors hear evidence in a criminal case, they must consider whether the prosecution or the defense has the best explanation to cover all the points of evidence. While there may be no certainty about their verdict, since there may exist additional evidence that was not admitted in the case, they make their best guess based on what they know.

**MEMORANDUM DECISION AND ORDER - 7**

outcome of this case. Omitting Gilbert's testimony still leaves the evidence supporting the conviction at an "overwhelming" level. The Court concludes that Petitioner is not entitled to habeas corpus relief, and his claims will be denied and dismissed with prejudice, for the reasons that follow.

## PETITIONER'S HABEAS CORPUS CLAIMS

Petitioner brings the following claims in his Amended Petition for Writ of Habeas Corpus (Dkt. 22):

1. Claim One is that Petitioner's counsel was ineffective for refusing to allow Petitioner to testify even after Petitioner requested the opportunity to testify. (Dkt. 22, pp. 4-9.)

2. Claim Two is prosecutorial misconduct, particularly, that the prosecutor knew the victim, C.B., had told a detective that Petitioner *punched her outside near the car*, but the prosecutor instead elicited testimony from the victim that she was *slapped inside the house*. (Dkt. 22, p. 14.)

3. Claim Three, the ineffective assistance counterpart of Claim Two, is that "trial counsel during the jury trial failed to perform fully and effectively the functions of trial counsel in that he did not bring to the attention of the court the wrongful actions of the state in presenting the incorrect testimony of C.B." (Dkt. 22, p. 15 (spelling and punctuation regularized).) Specifically, "the Prosecutor should have been constrained by knowledge of C.B.'s prior recorded statement, and [Petitioner] was harmed by her failure to do so." (*Id.*, p. 16.)

4. Claim Four is that trial counsel was ineffective for (a) failing to adequately investigate the defense, including a failure to "interview Dr. Plant about the cause of C.B.'s injuries" (Dkt. 22, p. 26) and learn he would testify that an open-handed slap could not have fractured C.B.'s jaw, and (b) failing to join in the state's motion for a continuance so that Pam Olsen (who told police Anderson hit C.B. with an open hand) would be present at trial. (*Id.*, pp. 27-36; see State's Lodging C-1, p.109.)

5. Claim Five is that counsel was ineffective for failing to call Detective Lewin as a witness to present, as exculpatory evidence, Pam Olsen's statement that Anderson slapped C.B. with an open hand (Dkts. 22, pp.37-38; 22-1, pp.1-2), and for failing to inform the court that the prosecutor engaged in misconduct by misleading the jury into believing Anderson punched C.B. with a closed fist. (*Id.*)

6. Claim Six is that counsel was ineffective for failing to investigate C.B.'s initial statement that he fell off a bicycle onto the porch of her ex-husband's mobile home, which may have caused her to fracture her jaw. (Dkt. 22-1, pp.3-5.)

7. Claim Seven is that direct appeal counsel performed ineffectively when counsel failed to challenge the trial court's denial of Anderson's motion for a mistrial based on a juror's revelation, made during trial, that he may have been the pre-op and post-op nurse for C.B. when she had surgery for her broken jaw. (Dkt. 22-1, pp.6-11.)

8. Claim Eight consists of the following prosecutorial misconduct allegations: (a) the prosecutor knowingly, willfully, intentionally, and fraudulently misrepresented facts to produce a wrongful conviction; (b) Dr. Plant testified that a slap to the face could not have caused C.B.'s injuries, but the prosecutor elected to falsify material facts to obtain a conviction and misled the jury to secure a conviction; (c) in closing argument, the prosecutor told the jury that they must find petitioner guilty of punching C.B. in the jaw with his closed fist; (d) the prosecutor's statements were not consistent with the facts of the case as reported to the police by the eyewitnesses; (e) Pam Olsen was the only eyewitness who could testify correctly that C.B. was slapped across the face by Petitioner, but she did not appear for the trial, and even though the prosecution sought a continuance to produce Olsen, the trial court refused to allow a continuance; (f) the prosecution moved the court to preclude Detective Lewin from being called as a witness, who could have testified that Olsen told him that Petitioner only slapped C.B., and that the slapping occurred in the kitchen; (g) the prosecutor "suppressed this evidence" to mislead the jury into believing Petitioner hit C.B. with a closed fist, because no trial witness testimony or document showed that Petitioner had hit C.B. with a closed fist. (Dkt. 22-1, pp. 12-20.)

9. Claim Nine is that prosecutorial misconduct occurred when the prosecution called Dan Winkler as a witness to testify that Petitioner had repeatedly hit C.B. outside, when the prosecutor knew these statements to be untrue, particularly because the other witness, Brenda Owens, testified that Petitioner never hit C.B. outside her

residence. Petitioner argues that police reports show otherwise. (Dkt. 22-1, pp. 19-21, Exhibits B and J.)

10. Claim Ten is that the prosecution committed a *Brady* violation when prosecutors failed to disclose the exculpatory evidence that Dr. Plant would testify that C.B.'s fractured jaw could not have been caused by a hand slap. (Dkt. 22-1, pp.22-24.)

11. Claim Eleven is that Petitioner's Sixth Amendment rights to confrontation and due process were violated in the following circumstances: At trial defense sought to introduce statements made by the complaining witness that a magistrate had ruled that she could not gain custody of her child as long as she continued to reside with [Petitioner]. This evidence was relevant to the complaining witness [sic] motivation to lie in order to convict Mr. Anderson and ensure his incarceration. The district court held that if this testimony was elicited, the prosecution would be allowed to "rehabilitate" the complaining witness by introducing the magistrate's ruling in the child custody proceeding regarding Mr. Anderson; that he was a convicted felon. (Dkt. 22-1, p.25 (capitalization modified).)

12. Claim Twelve is that trial counsel was ineffective for informing the jury during opening statement that C.B. had a motive to lie because a judge told her during a child protection proceeding she would not be reunified with her son as long as Anderson was living in her residence, without having admissible evidence to support such statement. (Dkt. 22-1, pp.31-36.)

Although several claims may be procedurally defaulted, Judge Boyle previously

determined that, because the procedural default analysis was complex, it was more

efficient to review the claims on the merits

## HABEAS CORPUS STANDARD OF LAW

Federal habeas corpus relief may be granted where a petitioner "is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a). Where the petitioner challenges a state court judgment in which the

petitioner's federal claims were adjudicated on the merits, then Title 28 U.S.C.§ 2254(d),

as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

applies. Title 28 U.S.C.§ 2254(d) limits relief to instances where the state court's

adjudication of the petitioner's claim:

1.  resulted in a decision that was contrary to, or involved an unreasonable
    application of, clearly established Federal law, as determined by the
    Supreme Court of the United States; or

2.  resulted in a decision that was based on an unreasonable determination of
    the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned

decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501

U.S. 797, 804 (1991).

Where a petitioner contests the state court's legal conclusions, including

application of the law to the facts, § 2254(d)(1) governs. That section consists of two

alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established

federal law "if the state court applies a rule different from the governing law set forth in

[the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court]

[has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694

(2002).

Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1) the petitioner must show that the state court—although it identified "the

correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably

applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

If the state appellate court did not decide a properly-asserted federal claim, if the state court's factual findings are unreasonable under § 2254(d)(2), or if an adequate excuse for the procedural default of a claim exists, then § 2254(d)(1) does not apply, and the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In such a case, as in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), and the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

## DISCUSSION OF CLAIM ONE

Claim One is that Petitioner's counsel, Anthony Valdez, was ineffective for refusing to allow Petitioner to testify, even after Petitioner requested the opportunity to testify. (Dkt. 22, pp. 4-9.)

## 1. State Court Decision

The Idaho Court of Appeals affirmed the state trial court's summary dismissal of this ineffective assistance claim because Petitioner failed to show any prejudice resulting from his failure to testify. The Idaho Court of Appeals concluded: "Even assuming that counsel was deficient, [Petitioner] has failed to prove that he suffered prejudice from counsel's alleged deficiency in light of the overwhelming evidence that his attack caused C.B.'s broken jaw." (State's Lodging D-15, p. 6.)

The Idaho Court of Appeals considered all of Petitioner's ineffective assistance of counsel claims cumulatively:

> Even if counsel had presented evidence that Anderson had slapped but not punched C.B., had shown that C.B. had fallen from a bicycle, had refrained from referencing a defense that could not be supported, and had demonstrated that witnesses may have had some motive to lie, it is highly unlikely that the jury would have concluded that Anderson did not cause C.B.'s injury. In our view, any reasonable jury would have concluded that Anderson inflicted C.B.'s injuries because there was no question that he hit her in the face, that shortly thereafter it was discovered that she had a broken jaw where he had struck her, and that the injury was not consistent with an accidental fall but was consistent with a penetrating blow.

> Further, calling Pam Olsen as a witness likely would have been more helpful to the prosecution than the defense. She was the only witness who could confirm C.B.'s testimony that she was struck in the kitchen by Anderson. There is no reason to believe that the jury would have doubted that Anderson inflicted the blow that broke C.B.'s jaw upon hearing Pam Olsen's testimony. Given all of the other evidence of his guilt, the jury more likely would have concluded that Olsen was mistaken or deceitful in her report that Anderson used an open hand.

Accordingly, the district court did not err in dismissing these claims because Anderson has failed to make a prima facie showing of prejudice from the alleged ineffective assistance of counsel.

(State's Lodging D-15, pp.6-7.)

## 2. Clearly-Established Law

The Idaho Court of Appeals correctly identified *Strickland v. Washington,* 466 U.S. 668 (1984), as governing case law from the United States Supreme Court. A defendant challenging his counsel's performance as ineffective must meet a two-prong test. *See id*. First, the defendant must show that counsel's performance was so deficient that he failed to function as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 691-92. The second prong requires that the defendant show that the deficient performance prejudiced the defense. *Id.* Unless both showings are made, a defendant is not entitled to relief. *Id.*

When undertaking an analysis of counsel's performance using the "doubly-deferential judicial review that applies to a *Strickland* claim under the § 2254(d)(1) standard," *Knowles v. Mirzayance*, 536 U.S. 111, 123 (2009), the federal habeas court must determine which arguments could have supported the state courts' decisions. *Richter*, 562 U.S. at 102.

An accused's right to testify is a constitutional right of fundamental dimension, but it is a right that is not without limitations. *Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987). The *Rock* Court acknowledged that "the right 'may, in appropriate cases, bow to

accommodate other legitimate interests in the criminal trial process.'" *Id*. at 56 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). Because the right to testify is personal, it may be relinquished only by the defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Counterbalancing the right to testify are important implications arising from a defendant's choice to be represented by counsel. The *Jones* Court noted, "The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." 304 U.S. at 465. Whether a defendant testifies is usually attributed to the tactical strategy of counsel, who has weighed the benefits and risks of testifying, including exposing the defendant to cross-examination. The Supreme Court has opined that, "absent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." *Reed v. Ross*, 468 U.S. 1, 13 (1984).

### 3. Analysis

Petitioner asserts that his trial counsel was ineffective for refusing to allow Petitioner to testify. (Dkt. 22, pp. 4-9.) Petitioner argues that the state courts erred in determining that whether Petitioner should be called to testify was within the bounds of a strategic decision of counsel. (*Id*., pp. 4-5.) Petitioner asserts that a defendant has a fundamental right to testify, even if his counsel believes it would be a strategic mistake, and his counsel should not have prevented him from testifying on his own behalf.

Petitioner originally intended to remain silent at trial. After he heard Dr. Plant testify that an open hand could not have caused the break, and Petitioner realized that Pam Olsen was not going to be called to testify that Petitioner hit C.B. with an open hand, Petitioner changed his mind, because he wanted to testify that he slapped C.B. with an open hand. Petitioner asked his counsel, Mr. Valdez, if he could testify, and Mr. Valdez "refused to allow him to do so." (Dkt. 22, p. 4.)

However, the trial record does not reflect any facts tending to show that Petitioner sought to override his counsel's advice by bringing the disagreement to the attention of the court (such as by trying to take the stand despite his counsel's advice, or asking the court to require counsel to withdraw from the case due to the disagreement), which supports the state court's decision that the failure to testify can be classified as a strategic call. Petitioner counters that, during several pretrial hearings, he had attempted to address the Court, and the Court specifically directed him to speak with his counsel and then speak to the Court through counsel (for example, the court explained that this was a precautionary measure, because anything he said could be used to prosecute him). (Dkt. 56, p. 6.) Petitioner states that he became too intimidated to address the Court again. However, nothing prevented Petitioner from asking his counsel to bring the disagreement about testifying to the court's attention, or from asking his counsel to withdraw so that Petitioner could testify and complete the trial according to his own strategy. To the extent that Petitioner argues that the Idaho Court of Appeals erred in the application of the law

to the facts or in the finding of the facts, he has not carried his burden to show any error or unreasonableness in that court's characterization of the facts as a call of strategy rather than an absolute denial of the right to testify.[2]

The Court next reviews whether counsel's allegedly wrongful advice about whether Petitioner should testify amounted to ineffective assistance of counsel.[3] Pam Olsen was the only witness who saw Petitioner strike C.B., and she had reported to Detective Lewin that Petitioner "hit [C.B.] ['with an open hand'] with great force across the face, knocking [C.B.] out of the chair onto the floor." (State's Lodging C-1, Post-Conviction Petition, Exhibit B). In the absence of Pam Olsen's and Petitioner's testimony, *no* witness testified at trial that Petitioner actually struck C.B.

The Idaho Court of Appeals reviewed only the prejudice prong of the ineffective assistance of counsel test, concluding that, even if the jury had heard Petitioner's or Pam Olsen's testimony about the open-handed hit, there was too much corroborating evidence in the record from other sources to reach any conclusion but that Petitioner's strike to C.B.'s face in the kitchen caused the broken jaw. This Court agrees. On this record, the evidence and chronology lead to the conclusion that it was Petitioner's hand that broke

---

[2] Petitioner's argument that a defendant need not object at trial to preserve a claim that counsel prevented him from exercising the right to testify is not relevant to the issue here. The issue is not whether Petitioner preserved the claim so that it could be asserted in a post-conviction matter, but the issue is whether Petitioner's counsel actually prevented Petitioner from testifying, against Petitioner's will; or whether Petitioner's counsel advised him not to testify and, though Petitioner disagreed, he willfully decided to put aside his disagreement, accept the advice, and continue with counsel's strategy.

[3] Petitioner argues in his Traverse that he did not even know that he had the ultimate right to decide whether to testify or that he had the right to override his attorney's advice that he should not testify. This is a different ineffective assistance of counsel claim—the failure to advise the defendant that he, not counsel, has the right to determine whether he should testify. Even if that is the case, Petitioner's claim still fails on the prejudice prong.

C.B.'s jaw, and it was the broken jaw that caused C.B. to immediately start screaming in pain in the kitchen on July 12, 1998. It makes little sense that Petitioner believes if he would have testified that he merely "slapped" C.B., the jury would have concluded that Petitioner's broken jaw was caused by a random bicycle accident sometime between July 12 and July 14, and not by his blow to C.B.'s face, even though C.B. was found on the floor screaming in pain from her jaw directly after the blow. This Court concludes that the decision of the Idaho Court of Appeals that no prejudice resulted from Petitioner's failure to testify at trial was not an unreasonable application of *Strickland*.

## DISCUSSION OF CLAIMS TWO, EIGHT, AND NINE

Claims Two, Eight, and Nine are all prosecutorial misconduct claims. Respondent previously asserted that these claims are procedurally defaulted. Rather than conduct a procedural default and cause and prejudice analysis, the Court concludes that the claims have no merit on de novo review, for the following reasons.

The standard of law governing prosecutorial misconduct is as follows. A prosecutor's misconduct will require reversal of a state court conviction only where the comments or actions sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Inquiry into the fundamental fairness of a trial requires the court to examine the effect of any misconduct within the context of the entire proceedings. *Id.*

### 1. Claim Two

Claim Two, based on prosecutorial misconduct, is that the prosecutor knew the victim, C.B., had told a detective that Petitioner *punched her outside near the car*, but the prosecutor instead elicited testimony from the victim that she was *slapped inside the house*. (Dkt. 22, p. 14.) The Court concludes that, even under a de novo standard, Petitioner has not shown that any prejudice resulted from the prosecution selectively eliciting statements from the victim at trial.

The Idaho Court of Appeals opined:

> Even accepting as true Anderson's assertions that C.B. originally told police that Anderson broke her jaw during a physical altercation in the driveway, instead of in the house as she testified at trial, such an inconsistency does not demonstrate that C.B. perjured herself, that the prosecutor elicited false testimony, or that Anderson's trial attorney was ineffective because he did not object to the testimony. First, Anderson incorrectly assumes that we must presume that C.B.'s earlier statements to the police were true and any later inconsistent statements were false. We know of no authority to support such a presumption. While the existence of a prior inconsistent statement may provide fertile ground for the impeachment of a witness, see I.R.E. 801(d)(1)(A), it does not necessarily preclude a party from eliciting subsequent contrary testimony. C.B.'s trial testimony may have been slightly different than her earlier statements to the police, but Anderson has not demonstrated that it was false. Second, whether Anderson broke the victim's jaw in the driveway, as she told the police, or in the house, as she testified at trial, is of little importance as the specific location is not an element of the offense. The victim consistently stated that Anderson took her glasses, that she argued with Anderson in the driveway as she attempted to recover her glasses, and that Anderson hit her in the face, breaking her jaw. Third, even if defense counsel could have prevented the admission of C.B.'s testimony that was inconsistent with prior statements, this deficiency was not prejudicial.

(State's Lodging F-4, p. 11.)

In her videotaped interview with Detective Lewin during investigation of the crime, C.B. said that Petitioner struck her outside, and that she did not remember being struck in the kitchen. (State's Lodging C-1, Post-Conviction Petition, Exhibit B; videotaped interview from Case No. 1:02-cv-00205-LMB.) At trial, C.B. testified that she sat down at the kitchen table, Petitioner came into the kitchen and argued with her, then someone leaned over the table, and the next thing she knew she was on the floor screaming because her face was hurt. (State's Lodging E-3, p. 158.) She did not know who struck her, because she did not have her glasses on. She testified at trial that she "believed" it was Petitioner who hit her in the kitchen because she had argued with him. (State's Lodging E-3, p. 159.) C.B. also testified at trial that she did not remember being hit, and when asked why she didn't remember, she testified: "I don't know. I just know there was a lot of pain." (State's Lodging E-3, p.199.) At trial, the prosecutor did not ask C.B. if Petitioner struck C.B. outside.

At trial, Dan Winkler testified that, during the struggle outside, "Steve had hit [C.B.] I did not see [C.B.] hit Steve, but she may have, trying to grab the bag." (State's Lodging E-3, p.65.) Also in his interview with Detective Lewin, Dan Winkler had stated that he believed it was the blow inside the kitchen that broke C.B.'s jaw. At trial, Brenda Owen testified that she did not see any physical contact between Petitioner and C.B. other than Petitioner grabbing C.B.'s glasses off her face, which cut C.B.'s nose. (*Id.*, p. 129.)

Petitioner has not shown that prosecutorial misconduct occurred when C.B. was not asked about whether she was hit outside. That fact has little relevance to the incident that obviously caused C.B. tremendous jaw pain—the strike to her jaw in the kitchen. In addition, the witnesses' testimony all differed as to whether C.B. had been struck outside, depending upon each witness's observation or perception. A prosecutor is not required to bring forward all evidence at trial, just disclose it before trial.

Petitioner argues that C.B. must have been lying because "she could not testify to what the argument was." (Dkt. 56, p. 14.) The fact that an argument had taken place inside the kitchen, however, is uncontested, as Petitioner testified about the argument in allocution at sentencing. (State's Lodging A-3, p. 110.) Therefore, Petitioner is hard-pressed to assert that C.B. was lying at trial about having an argument simply because she did not mention an argument to the detective during the initial investigation. Similarly, Petitioner's own proposed testimony is that he slapped C.B. in the kitchen, which is consistent with C.B.'s trial testimony that she believed it was Petitioner who struck her in the kitchen, though she didn't know. The testimony of other witnesses showing that C.B. was in no obvious physical distress after having been hit in the yard by Petitioner, and that she was screaming and crying in pain on the floor after being hit by Petitioner in the kitchen shows that it is more likely that the broken jaw occurred after the kitchen incident—regardless of what C.B. said *at any time*. That both C.B. and the prosecutor

used the process of abductive reasoning to determine that Petitioner hit C.B. in the

kitchen and broke her jaw does not equal deceit or prosecutorial misconduct.

This Court concludes that there is no procedural misconduct resulting from the

prosecutor having surveyed all of the evidence and having discarded irrelevant evidence,

such as whether C.B. believed Petitioner struck her outside. Neither did this act or

omission by the prosecutor sufficiently infect the trial to make it fundamentally unfair,

for the reason that the outside altercation was only remotely relevant.

### 2. Claim Eight

Claim Eight is a set of variations on Claim Two. Claim Eight consists of the

following prosecutorial misconduct allegations: (a) the prosecutor knowingly, willfully,

intentionally, and fraudulently misrepresented facts to produce a wrongful conviction; (b)

Dr. Plant testified that a slap to the face could not have caused C.B.'s injuries, but the

prosecutor elected to falsify material facts to obtain a conviction and misled the jury to

secure a conviction; (c) in closing argument, the prosecutor told the jury that they must

find petitioner guilty of punching C.B. in the jaw with his closed fist; (d) the prosecutor's

statements were not consistent with the facts of the case as reported to the police by the

eyewitnesses; (e) Pam Olsen was the only eyewitness who could testify correctly that

C.B. was slapped across the face by Petitioner, but she did not appear for the trial, and

even though the prosecution sought a continuance to produce Olsen, the trial court

refused to allow a continuance; (f) the prosecution moved the court to preclude Detective

Lewin from being called as a witness, who could have testified that Olsen told him that Petitioner only slapped C.B., and that the slapping occurred in the kitchen; (g) the prosecutor "suppressed this evidence" to mislead the jury into believing Petitioner hit C.B. with a closed fist, because no witness testimony or document was admitted to show that Petitioner had hit C.B. with a closed fist. (Dkt. 22-1, pp. 12-20.)

### A. Claim that the prosecutor knowingly, willfully, intentionally, and fraudulently misrepresented facts to produce a wrongful conviction

As outlined above, Petitioner and C.B. had two encounters that witnesses observed on the day of the crime. One was the tussle outside over C.B.'s glasses and Petitioner's black bag. The second was the incident in the kitchen, where C.B. and Petitioner briefly argued, and then Petitioner struck C.B.'s face, causing her to fall to the floor. The original police investigation focused on the outdoor incident, based on C.B.'s report of the incident. Additional analysis showed that the indoor incident was the more likely cause of C.B.'s broken jaw, given that the strike to the face was so forceful that it knocked C.B. to the floor; that C.B. exhibited signs of great pain directly after the indoor incident, but not after the outdoor incident; that Petitioner had an injured right hand after the incident; and that Dr. Plant's opinion about the mechanism of injury to C.B.'s law and Petitioner's hand matched the kitchen incident. That the prosecutor reviewed all of the evidence, selected that evidence favorable to the prosecution's position, and did not present the unfavorable testimony is not prosecutorial misconduct. The bulk of the evidence supported the theory that the jaw was broken in the kitchen.

**B. Claim that Dr. Plant testified that a slap to the face could not have caused C.B.'s injuries, but the prosecutor elected to falsify material facts to obtain a conviction and misled the jury to secure a conviction; and in closing argument, the prosecutor told the jury that they must find petitioner guilty of punching C.B. in the jaw with his closed fist**

The closing argument is the time when the prosecutor reviews everything favorable and unfavorable that was presented at trial and tries to causally connect the evidence to the defendant. Evidence that doesn't seem to fit with the majority of the evidence is discarded. The most likely conclusion that can be drawn from all of the evidence presented at this trial was that Petitioner struck C.B. in the kitchen with his hand so hard that it caused an injury to his hand and a broken jaw to C.B. There is no prosecutorial misconduct evident from the manner in which the prosecutor presented her closing argument.

**C. Claim that the prosecutor's statements were not consistent with the facts of the case as reported to the police by the eyewitnesses**

As shown above, the prosecution's case was consistent with some, but not all, of the witnesses' testimony. It is not possible to put on a case that is completely consistent with all witnesses' testimony, because each witness's testimony varies with his or her own perception, attention, involvement, and memory. In addition, how a witness responds depends on how a question is framed, and in what context it is asked, and so the same witness seldom gives identical testimony twice. No prosecutorial misconduct is evident from the prosecution's selection of evidence to present at trial.

***D. Claim that Pam Olsen was the only eyewitness who could testify correctly
that C.B. was slapped across the face by Petitioner, but she did not appear
for the trial, and even though the prosecution sought a continuance to
produce Olsen, the trial court refused to allow a continuance***

It is inconsistent and untenable that the prosecution wanted to hide Olsen's

testimony about the "opened handed" strike, and at the same time wanted to continue the

trial to obtain her presence as a trial witness. In addition, the prosecution proactively

addressed the issue that Petitioner allegedly had slapped C.B. in its case in chief by

introducing the unfavorable evidence via the expert witness. There is no prosecutorial

misconduct evident in these allegations. Because there was no one else in the kitchen but

Olsen, Petitioner, and C.B., and because witnesses came into the kitchen directly after the

strike and found C.B. on the floor screaming in pain, Olsen's testimony was not essential

to the prosecution's case. In addition, Olsen's testimony that Petitioner, in fact, inflicted

the blow, that the blow was inflicted "with great force," and that it was enough to "knock

C.B. out of the chair" would have cemented the prosecution's case. That is why the

prosecutor sought the trial continuance to produce Olsen. The open-handed versus the

close-fisted nature of the strike would have been of minimal value to Petitioner's case,

and Petitioner's counsel would not have been able to argue that someone else

altogether—Dan Winkler—struck Petitioner and caused C.B.'s broken jaw. There is no

prosecutorial misconduct evident in these allegations.

### E. Claim that the prosecution moved the court to preclude Detective Lewin from being called as a witness, who could have testified that Olsen told him that Petitioner only slapped C.B., and that the slapping occurred in the kitchen

Petitioner planned to call Detective Lewin to testify that C.B. told him that (1) Petitioner hit her outside, and (2) she needed to get Petitioner out of her home (which would have provided a motive for her to make up the story that it was Petitioner who hit her). The trial court ruled that if Petitioner cross-examined C.B. on the second point, then the prosecutor could rehabilitate her by eliciting testimony from her that "she was afraid of him, based on a history of beatings and a rape." (B-7, p. 4.) The scope of the ruling was unclear, and seemed to include Petitioner's "past crimes and misconduct that were not relevant because they did not bear upon C.B.'s incentive to go to the police." (*Id.*, p. 5.) In the face of this ruling, Petitioner's counsel withdrew his request to call Detective Lewin regarding the motive to lie. (*Id.*, p. 3.) However, the court and counsel agreed that Detective Lewin could be called regarding only the statement by C.B. that she was hit outside the house, and didn't remember being hit in the house. (E-3, p. 118-19.)

At trial C.B. testified consistently with her police statement that she didn't remember being hit in the house. (E-3, p. 207.) Therefore, defense counsel did not need to call Detective Lewin or use the statement to impeach her. It would not have been helpful for counsel to draw out testimony from C.B. regarding whether Petitioner hit her outside because that would have corroborated Dan Winkler's testimony that Petitioner hit

C.B. outside. Petitioner's counsel was trying to establish that Petitioner did not hit C.B. at all.

The prosecution did not commit misconduct by moving in limine to prevent Petitioner's counsel from delving into the child custody matter between C.B. and Winkler, in response to Petitioner's counsel's opening statement. The prosecution was well within permissible bounds in arguing that the judge's comments were inadmissible and the child custody matter was not relevant to the aggravated assault. The prosecution did not try to stop Petitioner from eliciting information regarding whether Petitioner stated that she did not remember being hit in the house. That point simply became moot when C.B. testified consistently with her prior statement at trial.

### F. Claim that the prosecutor "suppressed" evidence to mislead the jury into believing Petitioner hit C.B. with a closed fist, because no trial witness or document showed that Petitioner had hit C.B. with a closed fist

Petitioner also argues that the prosecutor "suppressed" evidence to mislead the jury into believing Petitioner hit C.B. with a closed fist, because no witness and no document at trial showed that Petitioner had hit C.B. with a closed fist. (Dkt. 22-1, pp. 12-20.) It is true that the evidence presented at trial showed that no one actually saw Petitioner hit C.B. in the kitchen, and only Dan Winkler testified that Petitioner hit C.B. outside (with no mention of a closed fist). Petitioner simply does not believe that this evidence was better for his defense than having Pam Olsen testify that Petitioner *in fact* struck C.B. with an open hand in the kitchen. As discussed above, there is no showing of

any suppression of evidence by the prosecution regarding an open hand or closed fist, because Petitioner already knew that Olsen had said "open hand." Neither attorney chose to use that testimony at trial, based on permissible strategy grounds.

### 3. Claim Nine

Claim Nine is that prosecutorial misconduct occurred when the prosecution called Dan Winkler as a witness to testify that Petitioner had repeatedly hit C.B. outside, when the prosecutor knew these statements to be untrue, particularly because the other witness, Brenda Owens, testified that Petitioner never hit C.B. outside her residence. (Dkt. 22-1, pp. 19-21, Exhibits B and J.)

Petitioner has produced no definitive evidence that either Dan Winkler's perception or Brenda Owen's perception of the struggle between C.B. and Petitioner for C.B.'s glasses and Petitioner's black bag was completely correct. One testified that Petitioner struck C.B. repeatedly outside, and the other testified that Petitioner did not strike C.B., but grabbed C.B.'s glasses from her face, which cut C.B.'s face. Witnesses can testify only to what they saw or believed they saw. The fact that witness accounts of the same incident vary is not a ground for prosecutorial misconduct. Rather, the jury is the factfinder at trial, deciding, among all the evidence placed before it, which evidence is true and which is untrue.

## DISCUSSION OF CLAIM THREE

Claim Three is the ineffective assistance counterpart of Claim Two, that trial counsel failed to bring to the attention of the court the wrongful actions of the state in presenting the "incorrect" testimony of C.B. (Dkt. 22, p. 15.) Specifically, Petitioner alleges that "the Prosecutor should have been constrained by knowledge of C.B.'s prior recorded statement, and [Petitioner] was harmed by her failure to do so." (Dkt. 22, p. 16.) As discussed in the context of Claim Two, the Idaho Court of Appeals, in its alternative ruling on the successive post-conviction petition, determined that no prejudice resulted from any alleged failure of counsel, and, thus, Petitioner's claim failed under *Strickland*. (State's Lodging F-4.)

For the reasons set forth directly above, this Court agrees that no prejudice resulted. Any objection to the prosecutor's elicitation of only selective portions of C.B.'s prior statement on prosecutorial misconduct grounds would have been denied by the trial court as without an adequate legal or factual basis. Accordingly, Claim Three is subject to dismissal or denial.

## DISCUSSION OF CLAIMS FOUR, FIVE, AND SIX

Claim Four is that trial counsel was ineffective for failing to adequately investigate the defense, including a failure to interview Dr. Plant about the cause of C.B.'s injuries (Dkt. 22, p. 26), failure to learn that Dr. Plant would testify that an open-handed hit could not have fractured C.B.'s jaw (*id*.), and failure to join in the state's motion for a

continuance so that Pam Olsen could be present at trial (*id*., pp.27-36; see State's Lodging C-1, p.109).

Claim Five is that counsel was ineffective for failing to call Detective Lewin as a witness to present, as exculpatory evidence, Pam Olsen's statement that Anderson hit C.B. with an open hand (Dkts. 22, pp.37-38; 22-1, pp.1-2), and for failing to inform the court that the prosecutor engaged in misconduct by misleading the jury into believing Anderson punched C.B. with a closed fist. (*Id*.)

Claim Six is that counsel was ineffective for failing to investigate C.B.'s original statement to Dr. Plant that she sustained the broken jaw when she fell off her bicycle and hit the porch of her ex-husband's mobile home. (Dkt. 22-1, pp.3-5; see State's Lodging C-1, post-conviction petition, Exhibit D, photographs of porch).

The *Strickland* Court outlined how to use the factors of deficient performance and prejudice to assess a claim that counsel failed to investigate a defendant's case:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.

In its discussion that follows, the Court groups Petitioner's claims according to topic, rather than in the order presented by Petitioner.

**1.  Failure to Call Pam Olsen and Detective Lewin**

Pam Olsen witnessed Petitioner walk into the kitchen and hit C.B. in the face with great force, knocking C.B. out of the chair onto the floor. Olsen said that Petitioner hit C.B. with an open hand. The information that Petitioner struck C.B. with *great force* and that the blow *knocked C.B. out of the chair* would have been much more damaging to Petitioner's case than the information about the open hand would have been helpful to his case.

It is an appropriate defense strategy to refrain from calling witnesses such as Pam Olsen whose overall testimony would have resulted in a net loss rather than a gain. Similarly, the Lewin police report and/or testimony contained the same problematic facts for Petitioner's case. Because there was no testimony at trial that anyone actually saw Petitioner strike C.B. in the kitchen, Petitioner's counsel called Lana Caudill to testify that C.B. told her that Dan Winkler broke her jaw. (State's Lodging E-3, pp. 213-215.) The Court concludes that calling a witness who could confirm that Petitioner struck C.B. in the kitchen would not have aided Petitioner's defense and would have weakened the defense's reliance on Lana Caudill. Petitioner has not shown any prejudice resulting from his attorney's failure to investigate Pam Olsen or any part of Detective Lewin's report.

### 2. Failure to Investigate Dr. Plant's Opinions and C.B.'s Bicycle Accident Story

Defense counsel did not try to interview Dr. Plant either after the prosecution disclosed him as a witness, or when the prosecution finally turned over Dr. Plant's opinion to Petitioner's counsel four days before trial. In addition, counsel had not gathered other evidence to support Petitioner's preferred defense that Petitioner merely slapped C.B. in the kitchen, and that C.B. instead broke her jaw later when she got on her bike without her glasses and rode into Dan Winker's porch. Had these investigations been done, Petitioner argues, he would have been found guilty only of misdemeanor assault for slapping C.B., not felony aggravated assault for breaking her jaw.

Dr. Plant testified at trial that he was immediately suspicious of C.B.'s bicycle accident story when she came to his office for a diagnosis, because the story was inconsistent with her injuries in several ways. Dr. Plant suspected that someone had punched C.B., which was a mechanism consistent with the injury. Dr. Plant also opined that an open-handed hit could not have caused the jaw to be broken in two places. (State's Lodging E-3, pp.34-35.) Dr. Plant testified that the force required to break the coronoid process in the jaw (a rarely-seen injury that occurs in only five of one thousand fractures) was so great that he would expect such a blow to injure both the jaw of the victim and the hand of the perpetrator. (*Id.*)

With additional investigation, Petitioner argues, he could have capitalized on Dr. Plant's additional testimony that, if C.B. had fallen into a rounded or padded object, she

could have sustained such an injury without having any bruising. (State's Lodging E-3, p.

33-35.) Petitioner argues that his counsel should have brought photographs of Winkler's

astroturf-covered stairs leading to his mobile home, to prove the porch was a padded

object that would not have left a mark on C. B.'s face, just as Dr. Plant described.

Petitioner's argument ignores the remainder of Dr. Plant's testimony. Petitioner is

correct that his nearly-implausible preferred defense would have been slightly better with

a photo of the stairs, but he errs in believing additional items would have led the jury to

believe the fall, not the hit, caused the broken jaw. Dr. Plant testified:

> Q.    So you were able to determine – so you're stating that the injuries you observed matched your description that she got hit in the face?
>
> A.    That would be my initial suspected [sic], unless there was something that came up off the porch that was *completely round*, which I haven't seen anything on a porch like that, from her description, that could fit that. If you fall flat on your face like that, *you're going to break your cheekbone, and you could break that joint, but you won't break this*.
>
> You have to get up *under* the cheekbone, because it's such a prominent thing on your face, to even get to that area to break that. And so that's really where a blunt object of some sort has been directly hit right below the cheekbone to that area (indicating).

(State's Lodging E-3, pp. 31-32 (emphasis added).)

Dr. Plant further emphasized on cross-examination:

> [W]hen I see a fracture of this magnitude – and in the x-ray when you look at that where that is fractured, there had to be a direct blow. And if you look at where everything joins together, that would be just right below the cheekbone. But this is so far deep in, that it's basically consistent with the story that I got in September, that there had to be a fist, would be the only

object I can come up with that would not leave a mark, other than swelling, and it would fracture right in that spot.

(*Id*., p. 43.)

In summary, while Dr. Plant testified that an open hand could not have caused the broken jaw and a completely rounded object on the porch possibly could have, Dr. Plant also confirmed that the cortoid process of the jaw could not be broken without a tremendous amount of direct force applied directly under the cheekbone.[4] Petitioner's argument requires the jury to disregard the majority of Dr. Plant's opinion, as well as all of the evidence regarding the kitchen incident and the reports that Petitioner injured his hand. Had Petitioner's counsel performed a more thorough investigation into Dr. Plant's opinion and the bicycle accident story, such a defense would not have been fruitful. Because Dr. Plant testified that *someone's* fist broke C.B.'s jaw, the better defense was the one that Petitioner's counsel presented—to point to another possible perpetrator— C.B.'s ex-husband, Dan Winkler. Accordingly, Petitioner has shown neither deficient performance nor prejudice.

### 3. Failure to Object to Prosecution's Conclusion that C.B. Was Punched

Because the majority of the evidence presented at trial suggested that the hit had to have been a punch, and the hit was delivered by Petitioner, the prosecutor did not engage in misconduct when she described it to the jury as a fist or punch. This conclusion is the

---

[4] This does not mean, as Petitioner suggests, that the strike had to be an "uppercut." It simply means that the blow had to strike below the cheekbone, the most prominent facial bone on the side of the face.

**MEMORANDUM DECISION AND ORDER - 35**

product of acceptable abductive reasoning, not prosecutorial misconduct. Therefore, Petitioner's counsel's objections would have been futile.

Accordingly, this Court concludes that the Court of Appeals' decision that there was no prejudice regarding any of these alleged deficiencies is a reasonable application of *Strickland*. Habeas corpus relief is not warranted.

## DISCUSSION OF CLAIM SEVEN

Claim Seven is that direct appeal counsel performed ineffectively when counsel failed to challenge the trial court's denial of Petitioner's motion for a mistrial based on a juror's disclosure, made during trial, that he may have been the pre-op and post-op nurse for C.B. when she had surgery for her broken jaw (Dkt. 22-1, pp.6-11).

The *Strickland* principles apply to determining ineffective assistance of appellate counsel claims. "Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). To show prejudice on appeal, a petitioner must show that his attorney failed to raise an issue obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission probably would have resulted in reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not ineffective for failing to raise such an issue, and

petitioner suffered no prejudice as a result of it not having been raised. *See Miller*, 882 F.2d at 1435.

The Idaho Court of Appeals relied on state law standards to determine whether the result of the direct appeal probably would have been reversal if appellate counsel would have brought the mistrial claim on direct appeal. That is, within the *Strickland* analytical framework, the Idaho Court of Appeals looked through to the standard for the granting of a mistrial: "A mistrial may be declared when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial."(State's Lodging D-15, p. 9 (citing Idaho Criminal Rule 29.1).) In particular, "[j]ury misconduct shown to have a reasonable probability of prejudicing the defendant may be the basis for a mistrial." (*Id.*, relying on *State v. Rhoades*, 829 P.3d 665, 668 (1991); and *Roll v. City of Middleton*, 771 P.3d 54, 58-60 (Idaho Ct. App. 1989).)

Other precedent regarding juror bias includes the following. A criminal defendant has a fundamental right under the Sixth and Fourteenth Amendments to a fair trial by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To be impartial, the jury must be "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). A juror may still be qualified to serve even though he is not "totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 800 (1975). Rather, "it is

sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id*.

The record reflects that Mr. Holm, a juror, disclosed during voir dire that he knew C.B.'s surgeon and had worked with him on a limited basis at an area hospital. Petitioner did not attempt to strike Mr. Holm from the jury panel after that disclosure. After the trial started, Mr. Holm, who was crying and greatly distraught, informed the trial judge and both counsel in chambers that he recognized C.B.'s face and thought he had provided pre-op and post-op care to C.B. for the surgery to repair her broken jaw. (State's Lodging E-3, pp. 169-93.) After the inquiry, the trial court allowed Mr. Holm to remain on the jury.

The Idaho Court of Appeals rejected Petitioner's speculation that (1) Mr. Holm had been a private employee of the surgeon and would have had access to C.B.'s complete medical records, such that Mr. Holm would have known that Petitioner was the cause of the injury; (2) that Mr. Holm had engaged in ongoing contact with C.B.; and (3) that Mr. Holm harbored deep sympathy for C.B.'s pain. (State's Lodging D-15, pp. 9-10.) There was no evidence in the record showing these allegations to be true. Rather, the record reflected that Mr. Holm was a hospital employee who worked with the surgeon from time to time and who provided limited pre-op and post-op care to C.B.

The Idaho Court of Appeals rejected Petitioner's contention that he was prejudiced when the trial court permitted the trial to proceed with Mr. Holm on the jury. The record

reflects that Mr. Holm stated in chambers that he did not remember any specific conversation with C.B., and that his normal routine would have been to speak with her about how she was doing, to reassure her, and to monitor her condition and level of pain. (State's Lodging A-2, pp. 175-78.) Mr. Holm had no extrinsic knowledge about C.B.'s condition other than an awareness that C.B was treated for a fractured jaw. The fact that C.B. sustained a fracture of the jaw was uncontested. (*Id.*, p.179.) Importantly, Mr. Holm stated that, although he had treated C.B. for her injury, he could still weigh the evidence at trial in an objective manner. (*Id.*, pp.180, 183-184.)

The Idaho Court of Appeals determined that Petitioner had not produced any evidence showing that Mr. Holm had access to extrinsic information on a material fact of the case, such as the type of blow that could have caused the injury or whether Petitioner had inflicted it.

Thus, the Court of Appeals concluded:

Even if appellate counsel had proceeded on this claim, [Petitioner] has not shown a substantial likelihood that this Court would have reversed the district court's order denying a mistrial. Because he has not shown how he was prejudiced by appellate counsel's alleged deficiencies, we cannot say that the post-conviction court erred in dismissing this claim.

(State's Lodging D-15, pp.9-10 (emphasis added).)

Petitioner argued that, because Mr. Holm was crying and distraught during the in camera interview, Mr. Holm had undue sympathy for C.B. However, the trial judge, who had opportunity to observe Mr. Holm and interview him in the presence of counsel,

determined that Mr. Holm was simply worried about whether he himself "would be perceived as a liar to th[e] court, and . . .he was very afraid that he had violated his oath to th[e] court." (State's Lodging E-3, pp. 190-91.)

When reviewing an ineffective assistance of appellate counsel claim, the Court must remain mindful that the *Strickland* standard of review that gives deference to counsel's decisionmaking is the de novo standard of review. Another layer of deference– to the state court decision– is afforded on federal habeas corpus review. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

The question before this Court, then, is whether the Idaho Court of Appeals' application of *Strickland* was reasonable, not whether it was erroneous. In its survey of cases from across the country on the underlying mistrial issue, this Court found two cases, in particular, that were somewhat similar to the facts in Petitioner's case. These

cases are not of precedential value, but are included only to show the range of issues and outcomes when a selected juror discovers he or she has a relationship with someone tied to the case; Idaho law governs mistrial issue underlying the *Strickland* claim. However, these are the types of cases an appellate attorney might have reviewed to determine whether the juror issue regarding Mr. Holm should be asserted on appeal.

In *Franklin v. Texas*, 138 S.W. 3d 351 (Tex. Crim. App. 2004), the defendant was charged with aggravated sexual assault of a child. During trial, after the State's first witness—the victim—testified, a juror revealed that, while she did not recognize the victim's name, when she saw the victim, the juror realized that she was the victim's assistant Girl Scout troop leader, and that her daughter was also in the same Girl Scout troop as the victim. The trial judge asked the juror whether she could consider the evidence and base her decision on the evidence, to which the juror responded affirmatively; however, the trial judge both denied the defendant the opportunity to interview the juror to discover whether the relationship affected the juror's ability to be impartial, and denied the defendant's motion for a mistrial. The Texas Criminal Court of Appeals affirmed the intermediate court of appeals' decision to vacate the conviction and require a new trial, agreeing with the reasoning that, because the trial court "refused to admit the information that would have permitted [it] to apply a harm analysis to the juror's failure to answer counsel's voir dire questions accurately," there was an "absence

of evidence that would allow [it] to determine beyond a reasonable doubt that the error did not contribute to the conviction." 138 S.W. 3d at 358.

In *Alvies v. Indiana*, 795 N.E. 2d 493 (Ind. Ct. App. 2003), a murder trial, three jurors revealed to the court that they had ties to the victim or witnesses, but after the court and counsel examined them, the court was confident they would be unbiased and the three jurors were not replaced with available alternate jurors. After being selected but before being sworn, the first juror revealed that, after she had returned home from being selected as a juror, her mother-in-law called her and said that her father-in-law was a second cousin of one of the victims. However, the first juror assured the trial court that regardless of what she had learned the evening prior, she would be able to listen to the evidence and jury instructions and base her decision solely on the evidence and testimony.

After the State's first witness testified, the second juror reported that he knew a former police officer witness. They currently worked together at a masonry and concrete business, where they served on different crews and saw each other "once in a while in the mornings." They had only a casual working relationship, and had engaged in no discussions about the Alvies case. Regarding the second juror, the court determined that the former officer's testimony would involve only what he saw when he arrived at the scene of the crimes.

A third juror disclosed during trial that she knew the coroner because he had installed carpet in her home and that she knew him well enough to say "hi" if she saw him. The juror had no opinion of the witness in his capacity as coroner and made it clear that her knowledge of the witness would not affect her ability to serve as a juror. The trial court denied the defendant's motion to remove her from the jury. *Id*. at 502-03. The state court of appeals affirmed the trial court's decision to leave all three jurors on the jury, because there was no prejudice to the defense.

These cases highlight the general principle that defense counsel must be afforded a thorough opportunity to probe a selected juror in camera to determine whether, notwithstanding the relationship the juror revealed, the juror can serve as an unbiased factfinder. The trial court reviews the juror's responses to determine whether the juror will be able to base his or her decision solely on the evidence and testimony. Declaring a mistrial is required only when the juror misconduct is shown to have a reasonable probability of prejudicing the defendant and depriving him of a fair trial. The trial court's decision is discretionary, and it will be overturned on appeal in the state courts only if it constitutes an abuse of discretion. In Idaho, the Idaho Court of Appeals has made it clear that there is no presumption of prejudice regarding juror misconduct.[5]

---

[5] The Idaho appellate courts have rejected the analytical model that begins with a presumption of prejudice, as Petitioner argues (Dkt. 56, p. 18, relying on *United States v. Madrid*, 842 F.2d 1090, 1093 (9th Cir. 1988)). The United States Supreme Court also rejected the presumption of prejudice model in *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) ("We have also come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered 'citadels of technicality.'"). Petitioner's citation to *Madrid* regards a juror's ex parte contact with a court clerk during deliberations, and is not legally or factually applicable here.

Petitioner admits that, during voir dire, he and his counsel obtained information from Mr. Holm that Mr. Holm had worked with C.B.'s surgeon at a local regional hospital from time to time. Apparently, nothing Mr. Holm revealed about that working relationship prompted Petitioner to strike him for cause or peremptorily; for example, Petitioner must not have been concerned that Mr. Holm might consider or weigh Dr. Plant's testimony more or less favorably because of their casual working relationship.

Beyond the working relationship of Dr. Plant and Mr. Holm, the fact that Mr. Holm actually treated the victim for the very injury that was at issue in the criminal case raises more cause for concern than the mere casual business relationship of a nurse/juror and the surgeon/witness. However, the record reveals no bias or prejudice of Mr. Holm against Petitioner. Mr. Holm's recollection of having treated the victim was vague. Mr. Holm's extraneous information about the case was limited to having (1) a knowledge of the injury, the pre-operative care, and the post-operative care, and (2) a short, nonpersonal nurse-patient relationship. The fact of the injury was uncontested at trial. Mr. Holm did not obtain any information from the patient about how the injury was caused.

Accordingly, there is no reasonable probability that Petitioner would have prevailed on this issue on appeal, had Petitioner's appellate counsel brought it before the Idaho Court of Appeals, given: (1) the overwhelming evidence from several different sources that Petitioner caused C.B.'s broken jaw in the kitchen, (2) Mr. Holm had no extrinsic evidence about the cause of the injury, but knowledge only about the

uncontested fact of the injury; (3) Mr. Holm did not express any undue sympathy toward the victim or any bias against Petitioner; and (4) Petitioner and his counsel already knew that Mr. Holm and Dr. Plant had a casual working relationship at the regional hospital. Under these circumstances and the doubly deferential standard of *Harrington v. Richter*, the Court concludes that the Idaho Court of Appeals' decision was not an unreasonable application of *Strickland* because Petitioner has not demonstrated deficient performance or prejudice regarding counsel's failure to raise the issue on direct appeal.

## DISCUSSION OF CLAIM TEN

Claim Ten is that the prosecution committed a *Brady* violation when it failed to disclose the exculpatory evidence that Dr. Plant would testify that C.B.'s fractured jaw could not have been caused by a hand slap. (Dkt. 22-1, pp.22-24.) Petitioner alleges that, on December 11, 1998, the prosecution mailed a notice to defense counsel that it would be calling Dr. Plant to testify, but it did not disclose the content and basis of the expert testimony, nor did it disclose medical records or examination reports of Dr. Plant concerning C.B.'s broken jaw. On February 12, 1999, the prosecution provided defense counsel with Dr. Plant's medical consultation form, but still had not provided a summary of Dr. Plant's proposed trial testimony. Petitioner alleges that, because he was charged with breaking C.B.'s jaw by an open-handed strike to the face, Dr. Plant's testimony that an open-handed strike could not have caused the broken jaw was exculpatory evidence

subject to the *Brady* disclosure rule. Also, as a result of the nondisclosure, Petitioner was

not prepared to call Pam Olsen, who could have testified to the open-handed strike.

It is well established that the prosecution has a duty under the Due Process

Clause of the Fourteenth Amendment to disclose to the defendant exculpatory evidence

that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963); *United*

*States v. Bagley*, 473 U.S. 667, 676 (1985). A meritorious *Brady* claim contains three

essential components: (1) the evidence must be favorable to the accused, either because it

is exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either

intentionally or inadvertently; and (3) the evidence must be material to guilt or

punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Suppressed evidence is material under *Brady*, and its non-disclosure is

prejudicial, when there is a reasonable probability that had the evidence been disclosed,

the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682; *Kyles v.*

*Whitley*, 514 U.S. 419, 433-34 (1995). In determining "materiality," the court must assess

the weight and force of the withheld evidence collectively, rather than item by item.

*Kyles*, 514 U.S. at 433-34.

The Idaho Court of Appeals rejected Petitioner's *Brady* claim, reasoning:

Even assuming that this was error, Anderson has failed to show how the
alleged misconduct amounted to prejudice or reversible error. *See*
*Raudebaugh v. State,* . . . 21 P.3d 924, 928 (Idaho 2001) (the petitioner did
not demonstrate how the State's nondisclosure of documents could have
altered the outcome of the trial). As we previously noted, even if Anderson
had presented a defense that he had slapped but not punched C.B., in light

of the other evidence, it is highly unlikely that the jury would have
concluded that Anderson did not cause C.B.'s injury.

(State's Lodging D-15, p.13.)

To prevail on this claim, Petitioner must demonstrate that the decision of the

Court of Appeals is an unreasonable application of *Brady*, *Bagley*, and *Kyles*, which

includes a showing that there is a reasonable probability that, had the evidence been

disclosed, the result of the proceeding would have been different. Even if Petitioner

would have had time to subpoena Pam Olsen to trial and bring in photos of the astroturf-

covered stairs, the other evidence is still overwhelming and would have outweighed the

"open-handed slap" theory, including (1) Petitioner hit C.B. in the kitchen with great

force, enough to knock her from her chair; (2) witnesses saw C.B. screaming in pain

directly after the strike; (3) Petitioner injured his hand when he struck C.B.; and (4)

expert witness testimony of the unlikeliness that the injury was sustained by falling. This

Court concludes that the Idaho Court of Appeals' decision was not unreasonable under

§2254(d)(1).

## DISCUSSION OF CLAIM ELEVEN

Claim Eleven is that Petitioner's Sixth Amendment rights to confrontation and due

process were violated when the trial judge required Petitioner to choose between

foregoing cross-examination of C.B. about her motive to go to the police to report the

broken jaw incident two weeks after the incident or having Petitioner's other bad acts

come in on rehabilitation examination if he chose to cross-examine C.B. about motive.

Particularly, at trial Petitioner's counsel announced during his opening statement that the jury would hear that C.B. had a motive for making a false report that Petitioner hit her—in her child protection case, a magistrate judge told her she could not continue to reside with Petitioner if she wanted to regain custody of her son (who resided with Dan Winkler), and C.B. wanted to ensure that Petitioner was convicted and incarcerated. The prosecution then moved in limine to exclude information regarding the child custody hearing that was irrelevant to the assault and that might unduly prejudice C.B. and Dan Winkler. The prosecutor successfully argued that, if Petitioner cross-examined C.B. about motive, C.B. should be able to discuss on rehabilitation her fear that Petitioner might kill her, based on the rape and other violent conduct. Petitioner's counsel chose to forego cross-examination into C.B.'s motive.

Petitioner did not raise the issue under the Confrontation Clause, but only as a state law evidentiary issue, and, therefore, he is not eligible for federal habeas corpus relief on a state law ground. However, this Court will review the reasonableness of the Idaho Court of Appeals' ruling on the claim under §2254(d)(1), to the extent that it states a federal due process cause of action, a claim that is often intertwined with state evidentiary issues, and then it will consider the Confrontation Clause argument.

**1. State Court Ruling**

The Idaho Court of Appeals determined:

> We begin by noting that the district court's ruling was imprecise as to exactly what type of evidence would be admitted if Anderson cross-

examined C.B. about her motive to lie. However, from the entire lengthy colloquy between the two counsel and the district court on this issue, we discern that the court was accepting the State's position that on redirect examination, C.B. should be allowed to testify about her motivation for going to the police, which could include her allegation that Anderson had just raped her and could also include an explanation that she was afraid that she would never see her son again because she feared that Anderson was going to kill her based upon multiple acts of violence against her. We find no error in this aspect of the court's ruling. Clearly, testimony that C.B. sought Anderson's arrest because she was afraid of him, based on a history of beatings and a rape, would be relevant to rehabilitate her with respect to her motive in going to the police.

(State's Lodging B-7, p. 4.)

The Idaho Court of Appeals agreed with Petitioner that the trial court's ruling was too broad regarding the scope of evidence that could have been included in the rehabilitative testimony. As a result of that error, the Idaho Court of Appeals performed a harmless error analysis under *Chapman v. California*, 386 U.S. 18, 22 (1976). (State's Lodging B-7, p. 5.) The Court of Appeals determined that, to the extent that the trial court's ruling was overbroad as to the admissibility of Anderson's prior conduct, which "dissuaded [Petitioner] from impeaching C.B., with her alleged motive to fabricate, any such error could not have contributed to the verdict." (*Id.*, p. 5.)

### 2. Due Process Clause and Harmless Error Analysis

The United States Supreme Court has clarified that, when a state appellate court has undertaken a *Chapman* harmless error review, the federal district court reviewing the decision under § 2254 applies the *Brecht* harmless error analysis. *See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("*Brecht* obviously subsumes AEDPA/*Chapman* review") (citing

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)). Under *Brecht*, a federal habeas court that determines constitutional error occurred cannot grant a writ of habeas corpus unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638.

This Court concludes that, even if the limitation on cross-examination violated Petitioner's due process rights, such an error was harmless under *Brecht*. If in error, the limitation did not have substantial and injurious effect or influence in determining the jury's verdict. As the Court has explained, the evidence pointing to Petitioner as the person who broke C.B.'s jaw is overwhelming, and evidence regarding motive to report the crime and/or past bad acts simply would not have called into question the sequence of events in the kitchen and the medical evidence supporting the verdict.

### 3. Confrontation Clause Analysis

Alternatively, the court agrees with Respondent that, as a Confrontation Clause claim under de novo review, Claim Eleven fails. The "main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 315-316 (1974). A trial judge is permitted to impose reasonable limits on cross-examination, without violating a defendant's right to confrontation." *Delaware v. Van Ardsall*, 475 U.S. 673, 679 (1986). In other words, "the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination

that is effective in whatever way, and to whatever extent, the defense might wish."

*Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original).

The right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias or self-interest in testifying. *Davis*, 415 U.S. at 316. The right is not unlimited, however, and a trial judge retains wide discretion in limiting the scope of cross-examination. *Van Arsdall*, 475 U.S. at 674. In determining whether there has been a Confrontation Clause violation, the court should examine the probative value of the proposed cross-examination. *Id*.

Petitioner was free to introduce the statements of C.B. that he thought established that she had an ulterior motive for fabricating the battery and rape charges against him— she wanted him to leave her household so that she could regain custody of her child. The trial court ruled that if Petitioner introduced these statements, the prosecution was free to rehabilitate C.B. by drawing out her testimony that it was Petitioner's past violent behavior that motivated her to report the crime. This is a reasonable limitation on cross-examination that balanced Petitioner's right to cross-examine C.B. on this particular point, and the state's interest in rebutting the allegations of improper motive. Petitioner otherwise had great leeway in cross-examining C.B. on all aspects of her allegations behind the aggravated assault charge. *Cf. Van Arsdall,* 475 U.S. at 677 (Confrontation Clause was violated when court prohibited *all* cross-examination into a witness's bias); *U.S. v. Strothers*, 77 F.3d 1389 (D.C. Cir. 1996) (foregoing cross-examination to avoid

admission of negative rebuttal evidence was a strategic choice, not a limitation on cross-examination).[6] Based on the foregoing, the trial court's decision that cross-examination would open the door to certain rebuttal evidence did not violate the Confrontation Clause.

## DISCUSSION OF CLAIM TWELVE

Claim Twelve is that trial counsel was ineffective for informing the jury during Petitioner's opening statement that C.B. had a motive to lie because a judge told her during a child protection proceeding she would not be reunified with her son so long as Anderson was living in her residence, because counsel knew or should have known he did not have *admissible* evidence to support such statement. (Dkt. 22-1, pp.31-36.) Petitioner asserts that his credibility was damaged when the judge's ruling rendered him unable to support the opening statement reference to C.B.'s improper motive for attributing the broken jaw to Petitioner.

As discussed above, Petitioner's counsel planned to cross-examine C.B. regarding her inability to regain custody of her son if Petitioner continued to reside with her. However, the prosecution stepped in after opening argument with an oral motion in

---

[6] In *Strothers*, the appellate court explained:

> The court at no time prohibited the appellants from impeaching Pratt's reliability by cross-examining him about his mental health but simply ruled that if they did the government could put Pratt's mental health into context on redirect. The appellants themselves then made the strategic choice to limit their examination of Pratt. They cannot now transform that choice into judicial error. *Cf. United States v. Tarantino*, 846 F.2d 1384, 1407 (D.C.Cir.) (holding that forcing defendant to make tactical decision whether to cross-examine witness and thereby open door to prejudicial contextual information did not violate confrontation clause or constitute abuse of discretion), cert. denied, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988).

77 F.3d at 1393.

limine to prohibit Petitioner's counsel from referencing what the judge in the custody matter had said and from bringing in evidence about C.B. and Dan Winkler's custody case. After the motion, the court heard extensive argument from both sides, and then required Petitioner to choose between including this subject on cross-examination and having C.B. testify about the rape incident and prior domestic abuse. The trial court also determined that any statements made by the judge presiding over the child custody case would have been inadmissible and should not have been included in the opening argument. (State's Lodging E-3, pp. 94-95.)

Petitioner provides much argument regarding trial counsel's reference to inadmissible evidence—the child custody judge's statement—as deficient performance. However, Petitioner's counsel could have cross-examined C.B. about other aspects regarding the child custody matter without specifically referencing the judge. Petitioner's counsel need not have anticipated that the prosecution would attempt to (wrongly) argue that the scope of rehabilitation regarding motive should be so broad. Petitioner's counsel's reference to the judge in the opening argument does not show that counsel's plan was a futile one focused solely on the judge's statements. For example, he could have cross-examined C.B. about her understanding of what she needed to do to regain custody of her child, to avoid asking about the judge's statements.

This Court need not determine deficient performance, however, because the Idaho Court of Appeals *assumed* that Petitioner's counsel performed deficiently, and then

concluded that Petitioner still failed to meet the prejudice prong of the *Strickland* test. "Even if counsel had presented evidence that [Petitioner] had slapped but not punched C.B., had shown that C.B. had fallen from a bicycle, had refrained from referencing a defense that could not be supported, and had demonstrated that witnesses may have had some motive to lie, it is highly unlikely that the jury would have concluded that [Petitioner] did not cause C.B.'s injury," the Court of Appeals reasoned. (State's Lodging D-15.)

As detailed above, this Court agrees that the straightforward cause and effect analysis required to determine how C.B.'s jaw was broken is not affected by defense counsel's reference to a tangential fact that he did not support at trial, or by the jury not hearing whether C.B. had a motive to lie about the cause of her broken jaw. Petitioner's story that he merely slapped C.B., she independently fell out of the chair as a result of her efforts to grab his camera bag, and that she sustained her injury well after the slapping incident as a result of riding her bike without her glasses (though nearly blind) is simply untenable in light of all of the evidence. As a result, the Court concludes that the Idaho Court of Appeals' *Strickland* analysis is not unreasonable, and habeas corpus relief is not warranted.

## DISCUSSION OF PETITIONER'S CONTENTION THAT THE IDAHO COURT OF APPEALS UNREASONABLY DETERMINED THE FACTS

### 1. Standard of Law

When a party contests the reasonableness of the state court's factual determinations under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The United States Court of Appeals for the Ninth Circuit has identified five types of unreasonable factual determinations that result from procedural flaws that occurred in state court proceedings: (1) when state courts fail to make a finding of fact; (2) when courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing"; (4) when courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim; or (5) when "the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor v. Maddox*, 366 F.3d. 992, 1000-01 (9th Cir. 2004). State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

If the state court factual determination was unreasonable, then the federal court is not limited by § 2254(d)(1), but proceeds to a de novo review of the claims, which may

include consideration of evidence outside the state court record, subject to the limitations of § 2254(e)(2). *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### 2. Patrick Gilbert Testimony

Here, the Idaho Court of Appeals plainly misstated the record in including the testimony of Patrick Gilbert as part of the "overwhelming evidence" supporting the conviction in the aggravated battery case. While that testimony clearly supports the conviction *in theory*, the testimony was presented to a different jury in the subsequent rape trial, and, thus the jury in the aggravated battery trial did not have an opportunity to weigh that testimony in coming to the guilty verdict in the battery case. However, it is clear that, without the Patrick Gilbert testimony, the evidence still was overwhelming; with addition of this evidence under the de novo standard—when the Court surveys all possible evidence that could have been presented—it adds to the overwhelming nature of the evidence supporting the aggravated battery conviction. Therefore, either under a §2254(d)(2) or de novo review standard, the misstatement of the record did not cause the overall factual finding to be unreasonable and does not materially affect the outcome on federal habeas corpus review. Accordingly, no relief is warranted on this basis.

### 3. General Contention of Unreasonable Fact Finding

In his Traverse, Petitioner generally contends that the Idaho Court of Appeals unreasonably determined the facts underlying its decisions. However, he makes no clear arguments under 28 U.S.C. §2254(d)(2). (Dkt. 56, p. 1.) To the extent that Petitioner's

§2254(d)(2) arguments are embodied in the claims that are subject to AEDPA, the Court concludes that Petitioner has not met his burden to show the factual findings of the state courts are unreasonable, for the reasons set forth above. To the extent that Petitioner simply disagrees with the facts found by the jury at trial or found by the state courts in the course of reviewing the conviction, he is not entitled to relief, for the reasons set forth above.

## CONCLUSION

A review of the entire record demonstrates that Petitioner is not entitled to relief on any of his habeas corpus claims, whether under an AEDPA or de novo standard of review. Therefore, the Amended Petition for Writ of Habeas Corpus will be denied, and this entire case will be dismissed with prejudice.

## REVIEW OF THE CLAIMS AND THE COURT'S DECISION
## FOR PURPOSES OF CERTIFICATE OF APPEALABILITY

In the event Petitioner files a notice of appeal from the Order and Judgment in this case, the Court now evaluates the claims within the Petition for suitability for issuance of a certificate of appealability (COA), which is required before a habeas corpus appeal can proceed. 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); Rule 11(a), Rules Governing Section 2254 Cases.

A COA will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a petitioner must show "that reasonable jurists could

debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed the petition or claim on the merits, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. The COA standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

Here, the Court has denied Petitioner's claims on the merits. The Court finds that additional briefing on the COA is not necessary. Having reviewed the record again, the Court concludes that reasonable jurists would not find debatable the Court's decision on the merits of the claims raised in the Petition and that the issues presented are not adequate to deserve encouragement to proceed further. As a result, the Court declines to grant a COA on any issue or claim in this action.

If he wishes to proceed to the United States Court of Appeals for the Ninth Circuit, Petitioner must file a notice of appeal in this Court **within thirty (30) days after entry of this Order**, and he may file a motion for COA in the Ninth Circuit Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b)(2).

# ORDER

**IT IS ORDERED:**

1. The Amended Petition for Writ of Habeas Corpus (Dkt. 22) is DENIED, and this entire action is DISMISSED with prejudice.

2. A certificate of appealability will not issue. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: March 31, 2015

B. Lynn Winmill
Chief Judge
United States District Court